Citation Nr: 1121866 
Decision Date: 06/06/11 Archive Date: 06/20/11

DOCKET NO. 07-40 307 ) DATE
 )
 )

On appeal from the
Department of Veterans Affairs Regional Office in St. Petersburg, Florida


THE ISSUES

1. Entitlement to an increased rating for major depression, currently rated as 50 percent disabling.

2. Entitlement to an increased rating for right shoulder bursitis with osteoarthritis, rated as 10 percent disabling prior to May 9, 2007, 20 percent from May 9, 2007, through December 11, 2007, and 30 percent from December 12, 2007.


REPRESENTATION

Appellant represented by: Disabled American Veterans


WITNESSES AT HEARING ON APPEAL

Appellant and his wife


ATTORNEY FOR THE BOARD

K. R. Fletcher, Counsel


INTRODUCTION

The Veteran served on active duty from June 1960 to June 1963 and October 1971 to May 1976.

This case comes before the Board of Veterans' Appeals (Board) on appeal from a February 2007 rating decision of the Department of Veterans Affairs (VA) Regional Office (RO) in Boston, Massachusetts. Jurisdiction over the case was subsequently transferred to the RO in St. Petersburg, Florida. In April 2010, the Veteran testified at a Travel Board hearing before the undersigned Veterans Law Judge. A transcript of that proceeding is of record. This case was before the Board in August 2010 when it was remanded for additional development.


FINDINGS OF FACT

1. For the period of the appeal, the Veteran's major depression has been productive of occupational and social impairment that has not more nearly approximated deficiencies in most areas than reduced reliability and productivity.

2. The Veteran is right hand dominant.

3. Prior to May 9, 2007, the Veteran's right shoulder disability was manifested by no more than osteoarthritis with painful motion; there was no limitation of motion at the shoulder level, ankylosis, dislocation, or fibrous union or nonunion of the humerus.

4. For the period from May 9, 2007, through December 11, 2007, the Veteran's right shoulder disability was manifested by limitation of arm motion at the shoulder level; there was no ankylosis, fibrous union or nonunion of the humerus. 

5. From December 12, 2007, the Veteran's right shoulder disability has been manifested by pain, weakness, and limitation of motion to 25 degrees from his side; there has been no ankylosis, fibrous union or nonunion of the humerus..


CONCLUSIONS OF LAW

1. The criteria for a rating in excess of 50 percent for major depression are not met. 38 U.S.C.A. § 1155 (West 2002); 38 C.F.R. §§ 4.7, 4.130, Diagnostic Code 9434 (2010).

2. The criteria for a rating in excess of 10 percent prior to May 9, 2007, and a rating in excess of 20 percent for the period from May 9, 2007, through December 11, 2007, for right shoulder disability are not met. 38 U.S.C.A. § 1155 (West 2002); 38 C.F.R. §§ 4.7, 4.10, 4.40, 4.45, 4.71a, Diagnostic Codes 5003, 5201 (2010).

3. The criteria for an increased 40 percent rating (but no higher) from December 12, 2007, for right shoulder disability have been met. 38 U.S.C.A. § 1155 (West 2002); 38 C.F.R. §§ 4.7, 4.10, 4.40, 4.45, 4.71a, Diagnostic Codes 5003, 5201 (2010).


REASONS AND BASES FOR FINDINGS AND CONCLUSIONS

I. Veterans Claims Assistance Act of 2000 (VCAA)

The VCAA, codified in pertinent part at 38 U.S.C.A. §§ 5103, 5103A (West 2002 & Supp. 2010), and the pertinent implementing regulation, codified at 38 C.F.R. § 3.159 (2010), provide that VA will assist a claimant in obtaining evidence necessary to substantiate a claim but is not required to provide assistance to a claimant if there is no reasonable possibility that such assistance would aid in substantiating the claim. They also require VA to notify the claimant and the claimant's representative, if any, of any information, and any medical or lay evidence, not previously provided to the Secretary that is necessary to substantiate the claim. As part of the notice, VA is to specifically inform the claimant and the claimant's representative, if any, of which portion, if any, of the evidence is to be provided by the claimant and which part, if any, VA will attempt to obtain on behalf of the claimant.

Although the regulation previously required VA to request that the claimant provide any evidence in the claimant's possession that pertains to the claim, the regulation has been amended to eliminate that requirement for claims pending before VA on or after May 30, 2008.

The Board also notes that the United States Court of Appeals for Veterans Claims (Court) has held that the plain language of 38 U.S.C.A. § 5103(a) requires that notice to a claimant pursuant to the VCAA be provided "at the time" that, or "immediately after," VA receives a complete or substantially complete application for VA-administered benefits. Pelegrini v. Principi, 18 Vet. App. 112, 119 (2004). The Court further held that VA failed to demonstrate that "lack of such a pre-AOJ-decision notice was not prejudicial to the appellant, see 38 U.S.C. § 7261(b)(2) (as amended by the Veterans Benefits Act of 2002, Pub. L. No. 107-330, § 401, 116 Stat. 2820, 2832) (providing that '[i]n making the determinations under [section 7261(a)], the Court shall...take due account of the rule of prejudicial error')."

The timing requirement enunciated in Pelegrini applies equally to the initial-disability-rating and effective-date elements of a service-connection claim. Dingess v. Nicholson, 19 Vet. App. 473 (2006).

The record reflects that the Veteran was provided all required notice by correspondence sent in October 2006, prior to the initial adjudication of the claims.

Regarding VA's duty to assist, all appropriate development to obtain the Veteran's pertinent medical records has been completed. In addition the Veteran has been afforded appropriate VA examinations. Neither the Veteran nor his representative has identified any outstanding evidence that should be obtained to substantiate the Veteran's claims. The Board is also unaware of any such evidence.

Accordingly, the Board will address the merits of the claims.

II. Law and Regulations - Increased Ratings

Disability evaluations are determined by the application of the VA's Schedule for Rating Disabilities (Rating Schedule), 38 C.F.R. Part 4 (2010). The percentage ratings in the Rating Schedule represent, as far as can be practicably determined, the average impairment in earning capacity resulting from diseases and injuries incurred or aggravated during military service and their residual conditions in civil occupations. 38 U.S.C.A. § 1155; 38 C.F.R. § 4.1.

When a question arises as to which of two ratings applies under a particular code, the higher rating is assigned if the disability more closely approximates the criteria for the higher rating. 38 C.F.R. § 4.7. After careful consideration of the evidence, any reasonable doubt remaining is resolved in favor of the veteran. 38 U.S.C.A. § 5107; 38 C.F.R. §§ 3.102, 4.3; Gilbert v. Derwinski, 1 Vet. App. 49, 55 (1990).

At the time of an initial rating, separate ratings can be assigned for separate periods of time based on the facts found-a practice known as "staged" ratings. Fenderson v. West, 12 Vet. App. 119 (1999). The Court has held that "staged" ratings are appropriate for an increased rating claim where the factual findings show distinct time periods when the service-connected disability exhibits symptoms that would warrant different ratings. Hart v. Mansfield, 21 Vet. App. 505 (2007).

It is the policy of VA to administer the law under a broad interpretation, consistent with the facts in each case with all reasonable doubt to be resolved in favor of the claimant; however, the reasonable doubt rule is not a means for reconciling actual conflict or a contradiction in the evidence. 38 C.F.R. § 4.3.

The Board notes that it has reviewed all of the evidence in the veteran's claims file, with an emphasis on the evidence relevant to this appeal. Although the Board has an obligation to provide reasons and bases supporting its decision, there is no need to discuss, in detail, every piece of evidence of record. Gonzales v. West, 218 F.3d 1378, 1380-81 (Fed. Cir. 2000) (holding that VA must review the entire record, but does not have to discuss each piece of evidence). Hence, the Board will summarize the relevant evidence where appropriate and the Board's analysis below will focus specifically on what the evidence shows, or fails to show, as to the claims.

III. Major Depression

Under the General Rating Formula for Mental Disorders, total occupational and social impairment due to such symptoms as: gross impairment in thought processes or communication; persistent delusions or hallucinations; grossly inappropriate behavior; persistent danger of hurting self or others; intermittent inability to perform activities of daily living (including maintenance of minimal personal hygiene); disorientation to time or place; memory loss for names of close relatives, own occupation, or own name warrants a 100 percent evaluation. Occupational and social impairment, with deficiencies in most areas, such as work, school, family relations, judgment, thinking, or mood, due to such symptoms as: suicidal ideation; obsessional rituals which interfere with routine activities; speech intermittently illogical, obscure, or irrelevant; near-continuous panic or depression affecting the ability to function independently, appropriately and effectively impaired impulse control (such as unprovoked irritability with periods of violence); spatial disorientation; neglect of personal appearance and hygiene; difficulty in adapting to stressful circumstances (including work or a worklike setting); inability to establish and maintain effective relationships warrants a 70 percent evaluation. Occupational and social impairment with reduced reliability and productivity due to such symptoms as: flattened affect; circumstantial, circumlocutory, or stereotyped speech; panic attacks more than once a week; difficulty in understanding complex commands; impairment of short- and long-term memory (e.g., retention of only highly learned material, forgetting to complete tasks); impaired judgment; impaired abstract thinking; disturbances of motivation and mood; difficulty in establishing and maintaining effective work and social relationships warrants a 50 percent evaluation. 38 C.F.R. § 4.130, Diagnostic Code 9434.

In assessing the evidence of record, it is important to note that the Global Assessment of Functioning (GAF) score is a scale reflecting the "psychological, social, and occupational functioning on a hypothetical continuum of mental health- illness." See Richard v. Brown, 9 Vet. App. 266, 267 (citing DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS, 4th ed. (DSM-IV) at 32).

Global Assessment of Functioning (GAF) Scale

Consider psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness. Do not include impairment in functioning due to physical (or environmental) limitations.

100
?
91
Superior functioning in a wide range of activities, life's problems never seem to get out of hand, is sought out by others because of his/her many positive qualities. No symptoms.
90
?
?
?
81
Absent of minimal symptoms (e.g., mild anxiety before an exam), good functioning in all areas, interested and involved in a wide range of activities, socially effective, generally satisfied with life, no more than everyday problems or concerns (e.g., an occasional argument with family members). 
80
?
?
71
If symptoms are present, they are transient and expectable reactions to psycho-social stressors (e.g., difficulty concentrating after family argument); no more than slight impairment in social, occupational, or school functioning (e.g., temporarily falling behind in schoolwork). 
70
?
?
61
Some mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful relationships.
60
?
?
51
Moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).
50
??
41
Serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).
40
?
?
?
?
31
Some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school). 
30
?
?
?
21
Behavior is considerably influenced by delusions or hallucinations OR
serious impairment in communication or judgment (e.g., sometimes
incoherent, acts grossly inappropriately, suicidal preoccupation) OR inability to function in almost all areas (e.g., stays in bed all day; no job, home or friends). 
20
?
?
?
11
Some danger of hurting self or others (e.g., suicidal attempts without clear expectation of death; frequent violent; manic excitement) OR occasionally fails to maintain minimal personal hygiene (e.g., smears feces) OR gross impairment in communication (e.g., largely incoherent or mute). 
10
?
?1
Persistent danger of severely hurting self or others (e.g., recurrent violence) OR persistent inability to maintain minimal personal hygiene OR serious suicidal act with clear expectation of death. 
0
Inadequate information

The symptoms listed in Diagnostic Code 9434 are not intended to constitute an exhaustive list, but rather serve as examples of the type and degree of the symptoms, or their effects, that would justify a particular rating. See Mauerhan v. Principi, 16 Vet. App. 436 (2002).

When evaluating a mental disorder, the rating agency shall consider the frequency, severity, and duration of psychiatric symptoms, the length of remissions, and the Veteran's capacity for adjustment during periods of remission. The rating agency shall assign an evaluation based on all the evidence of record that bears on occupational and social impairment rather than solely on the examiner's assessment of the level of disability at the moment of the examination. 38 C.F.R. § 4.126(a). When evaluating the level of disability from a mental disorder, the rating agency will consider the extent of social impairment, but shall not assign an evaluation solely on the basis of social impairment. 38 C.F.R. § 4.126(b).

Historically, a February 1990 rating decision awarded service connection (in pertinent part) for major depression. In July 2006, the Veteran submitted a claim for increased (greater than 50 percent) rating.

A June 2007 VA psychiatric examination report notes the Veteran's complaints of depressed mood, anxiety, social withdrawal, anhedonia, decreased appetite, excessive guilt, and feelings of worthlessness. On examination, the Veteran was clean and casually dressed. His speech was spontaneous and his affect was appropriate. He was oriented times three. Thought process was logical and goal-directed. The Veteran had no delusions, hallucinations, or inappropriate behavior. Impulse control was good. Mood was dysphoric. The Veteran was unable to do serial 7's or spell a word both forward and backward. He exhibited some ritualistic behavior (wetting his face 12 times or the day would not go right). He complained of occasional panic attacks and the presence of suicidal thoughts. The examiner noted that the Veteran was able to maintain minimal personal hygiene. His remote and immediate memory was good; his recent memory was mildly impaired. The examiner assigned a GAF score of 50 and found that there was not total occupational and social impairment.

Numerous VA outpatient treatment records have been associated with the claims folders. From 2007 through 2010, his VA providers noted the Veteran reported anxiety, impaired concentration and occasional suicidal ideation without any intent or plan. In those records, the Veteran was regularly described as alert, oriented, appropriately groomed, married and living with his wife, with no hallucinations or delusions. He had retired as a nurse and was taking classes at a local community college. In March 2008, June 2008 and August 2010, GAF scores were 50, 61 and 55 respectively.

During the April 2010 Board hearing, the Veteran reported having some memory and concentration problems, as well as daily panic attacks. He also reported having suicidal ideation. He stated that at times he did not want to leave the house and preferred to be left alone. 

An October 2010 VA psychiatric examination report notes the Veteran's complaints of daily anxiety and depressed mood, suicidal ideation without any intent or plan, poor energy and poor self-esteem. The Veteran indicated that he had been married to his wife for 27 years and the marriage was generally good. He reported daily panic attacks, at the same time of the day for one and a half to two hours. (The examiner noted that this was a very atypical account of a panic attack.) The Veteran reported that he had no close friends; he mentioned that this has been the case since his adolescence. He also reported some ritualistic behavior (wetting his face 12 times before shaving). On examination, the Veteran was clean, neatly groomed and appropriately dressed. He was oriented times three. Psychomotor activity was unremarkable. Speech was unremarkable, clear and coherent. Affect was constricted and mood was dysphoric. The Veteran was able to spell a word forward and backward. Thought process and content were unremarkable. The Veteran had no delusions or hallucinations. He slept six to seven hours per night. The Veteran exhibited no inappropriate behavior or episodes of violence. Remote, recent and immediate memory was normal. The Veteran had no problem with activities of daily living. The examiner noted that psychological testing revealed a high frequency of symptoms that are highly atypical in patients with genuine psychiatric or cognitive disorders, raising the suspicion of malingering. No GAF score was reported. The examiner opined that there was not total occupational and social impairment.

For the period of the appeal, the Veteran's major depression has been rated 50 percent. The evidence for this period shows occupational and social impairment with reduced reliability and productivity due to such symptoms as disturbances of motivation and mood and difficulty in establishing and maintaining effective relationships. Moreover, although the evidence shows that the Veteran's mood has been depressed, his depression has not affected his ability to function independently, appropriately and effectively. Although the Veteran has reported one daily ritual (wetting his face 12 times before shaving), this ritual does not interfere with routine activities, or prevent the Veteran from maintaining his personal appearance and hygiene. The Veteran has reported suicidal ideation, but denied any intent or plan. The evidence indicates that the Veteran still maintains a relationship with his wife, so it cannot be said that he is unable to establish and maintain effective relationships. The evidence does not show: speech intermittently illogical, obscure, or irrelevant; impaired impulse control (such as unprovoked irritability with periods of violence); spatial disorientation; neglect of personal appearance and hygiene; or an inability to establish and maintain effective relationships. Additionally, though the Veteran was given a GAF score of 50 in June 2007 and March 2008 indicating serious symptoms, his symptoms noted on examination do not correlate to the examples for that score. The Veteran reported thoughts of suicide but denied any intent or plan. He reported one daily ritual, which does not approximate the severity of "severe" obsessional rituals. He has had no problems with the law and has had a good relationship with his wife. The GAF scores of 55 and 61 assigned in August 2010 and June 2008 indicate mild to moderate symptoms and more accurately reflect the Veteran's symptoms as noted above. Therefore, the Veteran is entitled to no more than a 50 percent rating for his major depression for the entire period of the appeal.

III. Right Shoulder

The Veteran's right (major) shoulder disability is rated under Diagnostic Code 5019 (bursitis) which is rated based on limitation of motion of the affected part as degenerative arthritis.

Degenerative arthritis established by X-ray findings will be rated on the basis of limitation of motion under the appropriate diagnostic code(s) for the specific joint(s) involved. When, however, the limitation of motion of the specific joint(s) involved is noncompensable under the appropriate diagnostic code(s), a 10 percent rating is for application for each such major joint or group of minor joints affected by limitation of motion, to be combined, not added under Diagnostic Code 5003. Limitation of motion must be objectively confirmed by findings such as swelling, muscle spasm or satisfactory evidence of painful motion. 38 C.F.R. § 4.71a, Code 5003.

Under Diagnostic Code 5201, limitation of motion of the major arm at shoulder level warrants a 20 percent evaluation. Limitation of motion of the major arm midway between the side and shoulder level warrants a 30 percent evaluation. Limitation of motion of the major arm to 25 degrees from the side warrants a 40 percent evaluation. 38 C.F.R. § 4.71a, Diagnostic Code 5201.

(Other diagnostic codes for rating shoulder disability (5200, 5202, and 5203) are not for consideration because, as will be discussed below, the pathology required by such codes-ankylosis of the scapulohumeral articulation; flail shoulder; false flail joint; fibrous union of the humerus; recurrent dislocation of the humerus at the scapulohumeral joint; malunion of the humerus; or impairment of the clavicle or scapula ankylosis-is not shown.) 

In determining the degree of limitation of motion, the provisions of 38 C.F.R. §§ 4.10, 4.40 and 4.45 are for consideration. See DeLuca v. Brown, 8 Vet. App. 202 (1995).

The basis of disability evaluation is the ability of the body as a whole, or of the psyche, or of a system or organ of the body to function under the ordinary conditions of daily life including employment. 38 C.F.R. § 4.10.

Disability of the musculoskeletal system is primarily the inability, due to damage or infection in parts of the system, to perform the normal working movements of the body with normal excursion, strength, speed, coordination and endurance. Functional loss may be due to the absence or deformity of structures or other pathology, or it may be due to pain, supported by adequate pathology and evidenced by the visible behavior in undertaking the motion. Weakness is as important as limitation of motion, and a part that becomes painful on use must be regarded as seriously disabled. 38 C.F.R. § 4.40.

With respect to joints, in particular, the factors of disability reside in reductions of normal excursion of movements in different planes. Inquiry will be directed to more or less than normal movement, weakened movement, excess fatigability, incoordination, pain on movement, swelling, deformity or atrophy of disuse. 38 C.F.R. § 4.45.

Normal ranges of shoulder motion are defined by VA regulation as follows: forward elevation (flexion) from zero to 180 degrees; abduction from zero to 180 degrees; and internal and external rotation to 90 degrees. Lifting the arm to shoulder level is lifting it to 90 degrees. 38 C.F.R. § 4.71, Plate I

Historically, a February 1990 rating decision awarded service connection (in pertinent part) for right shoulder bursitis. A September 2003 VA QTC examination report notes the Veteran's complaints of shoulder pain. The Veteran reported that he was working 32 hours a week as a nurse; he had periodic absences because of various joint (especially the hand) problems. Examination of the right shoulder revealed mild limitation of flexion and extension of 140 degrees. Internal and external rotation was normal.

VA treatment records dated from July 2005 through June 2006 note that the Veteran was treated for numerous disabilities; however, no complaints or findings related to right shoulder disability were noted. 

In July 2006, the Veteran submitted a claim for an increased (greater than 10 percent) rating.

VA treatment records dated from July 2006 through September 2006 note that the Veteran was treated for numerous disabilities; however, no complaints or findings related to right shoulder disability were noted. 

The Veteran failed to report for a September 2006 VA QTC examination. In a March 2007 statement, the Veteran indicated that he had been in the process of moving and never received notice of the examination. 

VA treatment records dated from October 2006 to May 8, 2007, note that the Veteran was treated for numerous disabilities; however, no complaints or findings related to right shoulder disability were noted. On examination in December 2006, range of motion and strength were noted to be full in all extremities. 

A May 9, 2007, VA examination report notes the Veteran's complaints of shoulder pain. The Veteran reported worsening right shoulder pain and limitation of motion with flare-ups every two to three weeks. He denied any hospitalization or surgery for his right shoulder disability. He reported that he retired from his job as a nurse in 2006 because of his inability to perform expected duties. Examination revealed no joint deformity, loss of bone, instability, locking, effusion, ankylosis, subluxation, or dislocation. The examiner noted that there was some giving way, pain, stiffness and weakness. Range of motion was: from 0 degrees of extension to 120 degrees of flexion, with pain at 110 degrees; abduction from 0 degrees to 120 degrees with pain at 110 degrees; external rotation from 0 degrees to 90 degrees with pain at 80 degrees; and internal rotation from 0 degrees to 80 degrees with pain at 70 degrees. . The examiner stated that there was no additional limitation of motion on repetitive use. 

VA treatment records dated from June 2007 to September 2010 note that the Veteran was treated for numerous disabilities; however, no complaints or findings related to right shoulder disability were noted. 

In a December 12, 2007, VA Form 9, the Veteran indicated that his disability had worsened, stating that he was unable to work anymore due to his illness.

During an April 2010 hearing before the Board, the Veteran testified that his shoulder disability had gotten worse since May 2007. Specifically, he stated that he had trouble lifting things such as a pot of coffee with his right arm.

An October 2010 VA examination report notes the Veteran's complaints of pain and limitation of motion of the right shoulder. He reported daily locking episodes, repeated effusions, and weekly flare-ups lasting one to two days. During flare-ups the Veteran used a sling on his arm. He reported that he could not carry heavy objects with his right arm and his wife often had to help shave and dress him. He was only able to use his left hand to type on the computer. He denied any hospitalization or surgery for his right shoulder disability. He reported that he had not worked at his job as a nurse for two to five years because of joint and back problems. Examination of the right shoulder revealed no joint deformity, loss of bone, incoordination, ankylosis, or dislocation. The examiner noted that there were some giving way, crepitus, heat, guarding of movement, pain, instability, stiffness and weakness. Passive range of motion was: from 0 degrees of extension to 40 degrees of flexion, with pain at 10 degrees; abduction from 0 degrees to 50 degrees with pain at 10 degrees; external rotation from 0 degrees to 30 degrees with pain at 10 degrees; and internal rotation from 0 degrees to 20 degrees with pain at 10 degrees. Active range of motion was: from 0 degrees of extension to 20 degrees of flexion, with pain at 10 degrees; abduction from 0 degrees to 30 degrees with pain at 10 degrees; external rotation from 0 degrees to 30 degrees with pain at 10 degrees; and internal rotation from 0 degrees to 20 degrees with pain at 10 degrees. The examiner indicated that there was no additional limitation of motion on repetitive use. He also opined that the Veteran's right shoulder disability did not preclude sedentary employment not requiring the use of both arms.

In a December 2010 rating decision, the RO awarded an increased 20 percent rating, effective May 9, 2007, and an increased 30 percent rating, effective December 12, 2007, for the Veteran's right shoulder disability. The RO also awarded a TDIU rating, effective December 12, 2007.

Prior to May 9, 2007

For the period prior to May 9, 2007, the Veteran's service-connected right shoulder disability has been rated 10 percent disabling. A September 2003 VA QTC examination report notes the Veteran's complaints of shoulder pain and findings of mild limitation of flexion to140 degrees. Range of motion was otherwise normal. In July 2006, the Veteran maintained that his right shoulder disability was worse. However, although the Veteran was seen for numerous disabilities at VA clinics during this period, he made no complaints of right shoulder problems. Moreover, a December 2006 treatment record notes that range of motion in all extremities was normal. 

There is no basis for the assignment of any higher rating based on consideration of any of the factors addressed in 38 C.F.R. §§ 4.40, 4.45 and DeLuca, 8 Vet. App. at 204-7. Competent medical evidence reflects that the currently assigned 10 percent rating for the period prior to May 9, 2007, properly compensates him for the extent of functional loss resulting from any such symptoms. 

Inasmuch as there is no evidence of limitation of motion of the major arm at shoulder level prior to May 9, 2007, there is no basis for the assignment of a rating in excess of 10 percent under Diagnostic Code 5201 (for limitation of motion of the arm) for that period. 38 C.F.R. § 4.71a.

From May 9, 2007, through December 11, 2007

For the period from May 9, 2007, through December 11, 2007, the Veteran's service-connected right shoulder disability has been rated 20 percent disabling. The evidence for this period shows that he had abduction and flexion to 110 degrees (see May 9, 2007, VA examination report). These findings constitute evidence of limitation of motion of the major arm at shoulder level so as to warrant a 20 percent rating under Diagnostic Code 5201. As there were no findings of limitation of motion of the major arm that more nearly approximates limitation midway between the side and shoulder level at any time during the period from May 9, 2007, through December 11, 2007, the next higher (30 percent) rating under Diagnostic Code 5201 is not warranted. 

The Board has, as is required, considered the effect of pain in evaluating the Veteran's disability. Any functional impairment due to pain is contemplated by the 20 percent evaluation. See 38 C.F.R. §§ 4.40, 4.45, 4.71a, Diagnostic Code 5201. 





From December 12, 2007

For the period beginning December 12, 2007, the Veteran's service-connected right shoulder disability has been rated 30 percent disabling. The only medical evidence for this period is an October 2010 VA examination report, which shows objective evidence that, with consideration of pain, the Veteran's right shoulder motion was limited to 25 degrees or less, so as to warrant a 40 percent evaluation. Resolving reasonable doubt in the Veteran's favor, the Board finds that a 40 percent evaluation is warranted for the entire period from December 12, 2007, as the Veteran indicated in a December 2007 statement and October 2010 hearing testimony that his right shoulder disability had worsened since his May 2007 examination. 

A 40 percent evaluation for limitation of motion is the maximum schedular evaluation available under Diagnostic Code 5201. As noted above, no other diagnostic code is applicable in the absence of findings of ankylosis, fibrous union, recurrent dislocations or subluxations, or other objective manifestation which would warrant application of a different diagnostic code. 

Therefore, the Veteran is entitled to a 40 percent evaluation, the maximum schedular evaluation, under Diagnostic Code 5201, from December 12, 2007.

V. Extra-schedular Consideration

Consideration has also been given regarding whether the schedular evaluation is inadequate, thus requiring that the RO refer a claim to the Chief Benefits Director or the Director, Compensation and Pension Service, for consideration of "an extra- schedular evaluation commensurate with the average earning capacity impairment due exclusively to the service-connected disability or disabilities." 38 C.F.R. § 3.321(b)(1).

An extra-schedular evaluation is for consideration where a service-connected disability presents an exceptional or unusual disability picture with marked interference with employment or frequent periods of hospitalization that render impractical the application of the regular schedular standards. Floyd v. Brown, 9 Vet. App. 88, 94 (1996).

An exceptional or unusual disability picture occurs where the diagnostic criteria do not reasonably describe or contemplate the severity and symptomatology of the Veteran's service-connected disability. Thun v. Peake, 22 Vet. App. 111, 115 (2008).

If there is an exceptional or unusual disability picture, then the Board must consider whether the disability picture exhibits other factors such as marked interference with employment and frequent periods of hospitalization. Id. at 115-116. When those two elements are met, the appeal must be referred for consideration of the assignment of an extra-schedular rating. Otherwise, the schedular evaluation is adequate, and referral is not required. 38 C.F.R. § 3.321(b)(1); Thun, 22 Vet. App. at 116.

In this case, the schedular evaluations for the Veteran's major depression and right shoulder disability are not inadequate. Evaluations in excess of those assigned are provided for certain manifestations of the service-connected disabilities at issue, but the medical evidence reflects that those manifestations are not present in this case. Additionally, the diagnostic criteria adequately describe the severity and symptomatology of the Veteran's disorders. In sum, there is no indication that the average industrial impairment from these disabilities would be in excess of that contemplated by the assigned staged ratings, to include the increase granted herein. Moreover, the evidence does not demonstrate other related factors. Therefore, referral for extra-schedular consideration in this case is not in order.

VI. Entitlement to a Total Disability Rating based on Individual Unemployability or Extra-schedular Evaluation under 38 C.F.R. § 4.16

Once a veteran submits evidence of a disability, makes a claim for the highest rating possible, and submits evidence of unemployability, an informal claim for Total Disability for Individual Unemployability (TDIU) is raised. Roberson v. Principi, 251 F.3d 1378 (Fed. Cir. 2001); 38 C.F.R. § 3.155.

In this case the Veteran has already been granted a TDIU. Accordingly, further consideration of entitlement to a TDIU under the provisions of 38 C.F.R. § 4.16(a), or entitlement to extra-schedular consideration under the provisions of 38 C.F.R. § 4.16(b) is rendered moot.


ORDER

A rating in excess of 50 percent for major depression is denied.

The Board having determined that the Veteran's right shoulder bursitis with osteoarthritis warrants a 10 percent rating prior to May 9, 2007, a 20 percent for the period from May 9, 2007, through December 11, 2007, and a 40 percent rating from December 12, 2007, the benefit sought on appeal is granted to this extent and subject to the criteria governing the payment of monetary awards. 



____________________________________________
Shane A. Durkin
Veterans Law Judge, Board of Veterans' Appeals

Department of Veterans Affairs